**IN THE UNITED STATES DISTRICT COURT FOR**

**THE DISTRICT OF COLORADO**

| | |
|---|---|
| PAUL ZIEMBA, individually and on behalf of a class of all persons and entities similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>BANNER LIFE INSURANCE COMPANY,<br><br>and<br><br>ABE AL-FROUKH,<br><br>Defendants. | Case No. 1:26-cv-4181<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Preliminary Statement

1. Telemarketing calls are intrusive. A great many people object to these calls, which interfere with their lives, tie up their phone lines, and cause confusion and disruption on phone records. Faced with growing public criticism of abusive telephone marketing practices, Congress enacted the Telephone Consumer Protection Act of 1991. Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227). As Congress explained, the law was a response to Americans 'outraged over the proliferation of intrusive, nuisance calls to their homes from telemarketers' *id.* § 2(6), and sought to strike a balance between '[i]ndividuals' privacy rights, public safety interests, and commercial freedoms' *id.* § 2(9).

2. As the Supreme Court has explained, "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls. The Federal Government receives a staggering number of complaints about robocalls—3.7 million complaints in 2019 alone. The States likewise field a constant barrage of complaints. For nearly 30 years, the people's representatives in Congress have been fighting back. As relevant here, the Telephone Consumer Protection Act of 1991, known as the TCPA, generally prohibits robocalls to cell phones and home phones." *Barr v. Am. Ass'n of Political Consultants*, 140 S. Ct. 2335, 2343 (2020).

3. Plaintiff Paul Ziemba ("Plaintiff") brings this action under the TCPA alleging that Defendant Banner Life Insurance Company ("Banner Life" or "Defendant"), and its agent, Abe Al-Froukh ("Al-Froukh"), placed a telemarketing call to Plaintiff using an artificial or prerecorded voice, promoting the sale of Banner Life's life insurance products, without Plaintiff's prior express written consent.

4. Because this call was transmitted using technology capable of generating thousands of similar calls per day, Plaintiff sues on behalf of a proposed nationwide class of other persons who received similar calls.

5. A class action is the best means of obtaining redress for Defendants' illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

**Parties**

6. Plaintiff is an individual residing in Colorado Springs, El Paso County, Colorado.

7. Defendant Banner Life Insurance Company is a corporation with its principal place of business at 3275 Bennett Creek Avenue, Frederick, Maryland 21704.

8. Defendant Al-Froukh is an individual insurance agent who, upon information and belief, resides in Florida.

## Jurisdiction & Venue

9. The Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because the Plaintiff's claims arise under federal law.

10. Venue is proper under 28 U.S.C. § 1391(b)(2) because the call that is the subject of this litigation was initiated to the Plaintiff in this District and to encourage the purchase of services to be provided in this District. As such, a substantial part of the events giving rise to the claims occurred in this District.

## TCPA Background

Robocalls Outlawed:

11. The TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice ... to any telephone number assigned to a ... cellular telephone service." 47 U.S.C. § 227(b)(1). Calls made by an ATDS or with a prerecorded or artificial voice are referred to as "robocalls" by the Federal Communications Commission ("FCC") and herein. Encouraging people to hold robocallers accountable on behalf of their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

12. In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). Congress continued: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

13. The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

14. The FCC has made clear that "prior express written consent" is required before making telemarketing robocalls to wireless numbers. Specifically, it ordered:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In the Matter of Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote omitted) (internal quotation marks omitted).

## Factual Allegations

15. Defendant Banner Life is a life insurance company that markets and sells life insurance products directly and through independent or appointed insurance agents, including Defendant Al-Froukh.

16. Banner does substantially more than merely issue insurance policies that independent brokers happen to sell. Banner operates an "Advisor Hub" through which it provides insurance agents with marketing and sales support specifically designed to help agents attract new customers and close sales. Banner describes these resources as "Marketing materials to help you sell." *Advisor Hub*, BANNER LIFE, https://www.bannerlife.com/advisor [https://archive.li/b6Mez].

17. Banner also maintains a dedicated prospecting program for its agents. Banner represents that its advisor toolkits contain "compliance-approved and ready-for-use" materials, including talking points, client flyers, social media posts, frequently asked questions, and other sales materials. Banner additionally instructs its agents to consider "marketing automation," including software and applications that automate customer outreach. *Growing Your Client Base*, BANNER LIFE, https://www.bannerlife.com/advisor/prospecting [https://archive.li/bcA1v].

18. Plaintiff is a "person" as defined by 47 U.S.C. § 153(39).

19. Plaintiff's telephone number, (719) XXX-XXXX, is a cellular telephone number.

20. Plaintiff's telephone number is used for personal, family, and household purposes.

21. On June 16, 2026, Plaintiff received a telemarketing call on his cellular telephone from caller ID 217-387-8829.

22. The call began with what the Plaintiff perceived to be an artificial or prerecorded voice message.

23. After the artificial or prerecorded voice message played, the call was transferred to what the Plaintiff clearly perceived to be a live person who identified himself as Abe Al-Froukh.

24. Al-Froukh identified himself as a life insurance agent and solicited Plaintiff to purchase death/burial insurance.

25. During the call, Al-Froukh recited to Plaintiff his home address, city, and state, the ages of Plaintiff and his spouse, and the names and ages of Plaintiff's children who receive Social Security benefits on a monthly basis.

26. Al-Froukh then requested that Plaintiff provide his bank account number, Social Security number, and the amount of Plaintiff's monthly Social Security deposits.

27. Plaintiff declined to provide this sensitive personal and financial information over the phone and instead requested that Al-Froukh send him a written application.

28. Later that same day, Al-Froukh sent Plaintiff, via email from abealfroukhffl@gmail.com to Plaintiff's email address, a Banner Life Insurance Company life insurance application, and identified himself in the email as "Abe Al-Froukh, Licensed Insurance Agent & Private Broker."

29. Al-Froukh also sent Plaintiff, via text message call from telephone number (561) 232-8482, a digital business card identifying himself as "Abe Al-Froukh," bearing National Producer Number 21562192, contact telephone number (267) 774-6637, and

email address Abe.Al-Froukh@lifeinsurance.net, and describing him as a "Licensed Life Insurance Agent."

30. The call at issue was made using technology capable of generating thousands of similar calls per day.

31. The call was intended to promote Banner Life's insurance business and to sell Banner Life's life insurance products.

32. The call was made to solicit Plaintiff to purchase Banner Life's insurance products and services.

33. Plaintiff never provided his prior express written consent, or any consent, to receive prerecorded or artificial voice telemarketing calls from Defendants.

34. Plaintiff never did any business with Defendants prior to the call at issue.

35. Plaintiff's privacy was invaded by the above-described telemarketing call.

36. Plaintiff and all members of the Class, defined below, have been harmed by the acts of Defendants because their privacy was violated and they were annoyed and harassed. In addition, the call occupied their telephone lines, storage space, and bandwidth, rendering them unavailable for legitimate communication, including while driving, working, and performing other critical tasks.

37. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

38. In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

39. In 2013, the FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6574 ¶ 1 (2013).

40. Al-Froukh is an agent of Banner Life, and he placed, or caused to be placed, the telemarketing call to Plaintiff described above on Banner Life's behalf and for its benefit.

41. Banner Life provides material support to its agents to make illegal telemarketing calls. For example, Banner's "Campaigns in a Box" provide agents with ready-made talking points, case studies, client flyers, frequently asked questions, social media posts, and cross-selling materials intended to guide the agents' conversations with prospective customers and help agents sell Banner insurance products. *Advisor Toolkits*, BANNER LIFE https://www.bannerlife.com/advisor/prospecting/campaigns-in-a-box [https://archive.li/q7tNa].

42. Banner's control and assistance extends to the substance of an agent's sales pitch, including those made over the telephone. For example, Banner's 2026 Health Advisor Toolkit contains a specific "sales strategy," identifies circumstances in which an agent should introduce life insurance to a customer, supplies suggested language for doing so, provides a sales method, and supplies plug and play communications, social media materials, and responses for overcoming customer objections. *2026 Advisor Toolkit*, BANNER LIFE https://www.bannerlife.com/docs/default-

source/advisor/toolkits/health-cross-selling-toolkit/health-cross-selling-toolkit.pdf [https://archive.li/ADUG2].

43. Banner instructs agents to copy its prepared content into the communication platform of their choice, which would necessarily extend to the highly illegal prerecorded calls at issue here, to reach prospective customers and place insurance cases. *Id.*

44. Banner also provides agents with individualized, trackable links through which prospective customers can obtain quotes and submit Banner Life applications. Banner tells agents to “Share it anywhere,” including in emails, social media, text messages, and agency websites. Banner identifies “text message check-ins” as one place to use these links, tracks applications back to the individual agent, and automatically attributes commissions to that agent. *Id.*

45. Banner affirmatively encourages repeated dissemination of these marketing links. Its 2026 sales materials state that there is “no limit to how often” an agent can promote the individualized link, explain that an agent's earnings increase with the frequency with which the link is distributed, and encourage agents to distribute the links widely through emails, renewal notices, social-media posts, text messages, printed materials, and other communications. *Id.*

46. Banner also maintains formal training resources for its agents. Its website provides training materials and directs agents to contact Banner's sales team for access to Banner's “training presentation.” Banner further provides agents with a centralized Partner Dashboard through which agents manage their business, organize applications, and access Banner's tools. *Training and Support*, BANNER LIFE,

https://www.bannerlife.com/advisor/resources/training-and-support [https://archive.li/1ARIl].

47. Banner likewise exercises substantial control over who may solicit Banner insurance products. Banner's January 2026 agent manual, *The Basics*, states that Banner reviews an applicant-agent's financial responsibility, criminal history, and “business practices” against Banner's established selection criteria and will not offer an appointment to applicants who fail those standards. The same manual identifies Banner's Agent/Broker Agreement, Form AB-20, as one of the agreements through which agents are contracted to sell Banner products and states that each such contract requires a general agent to recommend the individual or entity for appointment. *The Basics*, BANNER LIFE, https://forms.lgamerica.com/thebasics.pdf [https://archive.li/37oBI].

48. Banner also expressly reserves control over the advertising and marketing used by its agents. Banner's January 2026 manual provides that Banner requires prior approval of materials that promote or mention Banner or that “could ultimately result in the sale” of a Banner product. Advertising developed by brokers must first be approved by the agency principal and then forwarded through the BGA to Banner for Banner's own review. Banner further requires advertisements to identify the person or entity appearing on the Banner contract. *Id.*

49. Banner's publicly available contracting materials further confirm the scope of the authority Banner grants to its insurance agents. Banner's current agent manual identifies Form AB-20 as Banner's Agent/Broker Agreement. A publicly available copy of that agreement provides that the agent/broker is “appointed to solicit applications” for Banner policies and must comply with Banner's underwriting guidelines, rules, and

regulations. Banner pays commissions on premiums for policies issued from applications procured pursuant to that authority. *Agent/Broker Agreement*, BANNER LIFE, https://www.goforforms.com/FORMS/BANN/AB-20.pdf [https://archive.li/Pime5].

50. The same Banner Agent/Broker Agreement reserves to Banner specific control over the marketing conduct that is directly relevant here. It requires an agent to comply with Banner's rules concerning advertising and prohibits an agent from using Banner's name or advertising Banner's products in any publication or other medium without Banner's prior written authorization. Banner also reserves the right to terminate the agent's agreement and to withhold commissions for specified misconduct. *Id.*

51. Banner maintains a separate *Advertising Compliance Review* governing the marketing activities of its agents. Banner defines advertising broadly to include verbal communications intended to generate interest in life insurance or induce a member of the public to inquire about or purchase insurance. Banner states that references to Banner and its products in electronic and other media are subject to advertising-compliance review, and requires prior Banner compliance approval of marketing materials that promote Banner's products or could ultimately result in a sale. *Advertising Compliance Review*, BANNER LIFE https://www.bannerlife.com/docs/default-source/brand-resources/laa1867.pdf [https://archive.li/EsiJg].

52. Particularly relevant here, Banner's own compliance materials expressly address the precise technology at issue in this action. Under the heading "Banner Life prohibits," Banner identifies advertising by text message, robocall, prerecorded voice message, autodialer, and the use of vendors, software, or other technology providing such services when used in violation of the Telephone Consumer Protection Act.

Banner's compliance rules therefore demonstrate that Banner was specifically aware that the use of prerecorded telephone calls to market Banner insurance products is regulated by the TCPA and had adopted rules governing such conduct by the agents authorized to sell its products. *The Basics*, BANNER LIFE, https://forms.lgamerica.com/thebasics.pdf [https://archive.li/37oBI].

53. Banner's policies are not merely aspirational. Banner's January 2026 manual requires every agent to understand both Banner's standards of business conduct and the terms of the agent's agreement with Banner, and expressly provides that lack of knowledge does not excuse noncompliance. Banner further states that, when Banner becomes aware that an agent violated company policy or an industry regulation, an internal investigation "will ensue" and may result in disciplinary action or termination.

54. Banner thus possesses and exercises the ability to select and appoint the agents who sell its products; provide those agents with sales training, talking points, marketing communications, and prospecting tools, regulate the content and manner in which Banner and its products are advertised, require compliance review and approval of marketing, track applications and sales to individual agents, compensate those agents for sales, investigate violations of Banner's policies and industry regulations, and discipline or terminate agents who violate those requirements.

55. Upon information and belief, Al-Froukh was appointed and/or otherwise authorized to solicit applications for Banner Life under Banner's Agent/Broker Agreement or a materially similar contractual arrangement. The precise agreement, contractual hierarchy, commission schedule, appointment records, communications,

training records, compliance records, and other documents defining that relationship are uniquely within Defendants' possession and will be the subject of discovery.

56. Al-Froukh was acting within the very authority Banner grants its agents when he accepted the transferred sales call from the highly-illegal prerecorded robot, solicited Plaintiff to purchase life insurance, and thereafter transmitted to Plaintiff a Banner Life insurance application. He was not purporting to sell some unrelated product for his own purposes. Rather, he was attempting to procure an application for a Banner Life policy, the activity for which Banner appoints and compensates its agents.

57. Banner therefore retained control over significant aspects of Al-Froukh's solicitation of customers, including whether he was authorized to sell Banner products, the Banner products he could offer, the use of Banner's identity and advertising, compliance with Banner's marketing rules, the materials and sales resources made available to him, the processing and attribution of resulting applications, his compensation for resulting policies, and Banner's ability to discipline or terminate him for violations. These facts support actual authority under federal common law agency principles.

58. The same facts support apparent authority. Banner authorizes appointed agents to solicit applications for Banner policies, supplies Banner sales and marketing resources for that purpose, requires marketing to identify the person or entity contracted to represent Banner, and permits its agents to transmit Banner applications to prospective insureds. Al-Froukh exercised precisely those manifestations of authority when, immediately following the telemarketing solicitation, he transmitted an application for insurance issued by Banner Life to Plaintiff.

59. Moreover, Banner's express prohibition against robocalls and prerecorded messages demonstrates that Banner anticipated the possibility that agents and vendors marketing Banner policies could employ precisely such technology and retained the authority to regulate it. The fact that Banner instructed its agents not to violate the TCPA does not eliminate Banner's agency relationship with an agent acting within his authorized role of soliciting Banner customers. Rather, it confirms Banner's retained authority to prescribe rules governing the means by which its agents market Banner products, and failed to exercise or insist on the exercise of such authority, thereby ratifying it.

60. There is an almost comical irony proving ratification here. Banner tells agents to aggressively distribute trackable sales material, including through text message calls, with frequency driving commissions and essentially unlimited promotion, while simultaneously maintaining a formal compliance regime that specifically purports to prohibit unsolicited texts and robocalls.

61. Accordingly, Banner Life is vicariously liable for Al-Froukh's violations of the TCPA under federal common law principles of agency.

62. Al-Froukh may also be personally liable for the acts alleged in this Complaint pursuant to 47 U.S.C. § 217 of the TCPA, which reads, *inter alia*: "[T]he act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user *as well as of that person*." 47 U.S.C. § 217 (emphasis added).

63. Al-Froukh personally directed the TCPA violative conduct at issue because he personally accepted the transferred call and personally solicited Plaintiff to purchase insurance during the call.

## Class Action Allegations

64. Plaintiff incorporates by reference all other paragraphs of this Complaint as if fully stated herein.

65. Plaintiff brings this action on behalf of himself and the following class (the "Class") pursuant to Federal Rule of Civil Procedure 23(b)(2) and/or (b)(3).

66. Plaintiff proposes the following Class definition, subject to amendment as appropriate:

> Robocall Class: All persons in the United States who, (1) within four years prior to the commencement of this litigation until the class is certified, (2) received one or more calls on their cellular telephone, (3) from or on behalf of Defendants, (4) sent using the same, or substantially similar, pre-recorded or artificial voice message used to contact the Plaintiff.

67. Plaintiff is a member of and will fairly and adequately represent and protect the interests of the Class as he has no interests that conflict with any of the Class members.

68. Plaintiff and all members of the Class have been harmed by the acts of Defendants, including, but not limited to, the invasion of their privacy, annoyance, waste of time, the use of their telephone power and network bandwidth, and the intrusion on their telephone that occupied it from receiving legitimate communications.

69. Members of the Class as defined above are identifiable through Defendants' dialer records, other phone records, and phone number databases.

70. Plaintiff does not know the exact number of members in the Class, but Plaintiff reasonably believes Class members number, at minimum, in the hundreds.

71. The joinder of all Class members is impracticable due to the size and relatively modest value of each individual claim.

72. Additionally, the disposition of the claims in a class action will provide substantial benefit to the parties and the Court in avoiding a multiplicity of identical suits.

73. There are well defined, nearly identical, questions of law and fact affecting all parties. The questions of law and fact, referred to above, involving the class claims predominate over questions that may affect individual Class members.

74. There are numerous questions of law and fact common to Plaintiff and to the proposed Class, including, but not limited to, the following:

a. whether an artificial voice or a pre-recorded message was used to send calls;

b. whether the telemarketing calls at issue were made to Plaintiff and members of the Class without first obtaining prior express written consent to make the call;

c. whether Defendants' conduct constitutes violations of the TCPA; and

d. whether members of the Class are entitled to treble damages based on the willfulness of Defendants' conduct.

75. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions, and especially TCPA class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class and have the financial resources to do so.

76. Common questions of law and fact predominate over questions affecting only individual Class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of Class members, which will be ascertainable from records maintained by Defendants and/or their agents.

77. The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case.

78. Excluded from the Class are counsel, Defendants, and any entities in which Defendants have a controlling interest, the Defendants' agents and employees, any judge to whom this action is assigned, and any member of such judge's staff and immediate family.

79. Plaintiff is not aware of any litigation concerning this controversy already commenced by others who meet the criteria for class membership described above.

## FIRST CAUSE OF ACTION
**Telephone Consumer Protection Act**
**(Violations of 47 U.S.C. § 227(b))**
**(On Behalf of Plaintiff and the Robocall Class)**

80. Plaintiff incorporates the allegations from all previous paragraphs as if fully set forth herein.

81. Defendants violated the TCPA by placing, or causing to be placed, a pre-recorded or artificial voice call to the cellular telephone of Plaintiff and members of the Robocall Class without their prior express written consent.

82. Defendants' violations were negligent, willful, or knowing.

83. As a result of Defendants' violations of 47 U.S.C. § 227 *et seq.*, Plaintiff and Robocall Class members are entitled to an award of $500 in statutory damages for each and every violation of the statute, pursuant to 47 U.S.C. § 227(b)(3)(B), and up to $1,500 in damages if the calls are found to be willful.

84. Plaintiff and Robocall Class members are also entitled to and do seek injunctive relief prohibiting Defendants from using a pre-recorded or artificial voice in the future, except for emergency purposes.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class, prays for the following relief:

- Injunctive relief prohibiting Defendants from placing telemarketing calls using an artificial or prerecorded voice, except for emergency purposes, in the future;
- That the Court enter a judgment awarding Plaintiff and all Class members statutory damages of $500 for each violation of the TCPA and $1,500 for each knowing or willful violation;
- An order certifying this action to be a proper class action pursuant to Federal Rule of Civil Procedure 23, establishing a Class the Court deems appropriate, finding that Plaintiff is a proper representative of the Class, and appointing the lawyers and law firms representing Plaintiff as counsel for the Class; and
- Such other relief as the Court deems just and proper.

## JURY DEMAND

**Plaintiff requests a jury trial as to all claims of the complaint so triable.**

RESPECTFULLY SUBMITTED AND DATED this 7th day of September, 2026.

*/s/ Andrew Roman Perrong*
Andrew Roman Perrong, Esq.
Perrong Law LLC
1669 Edgewood Road, Suite 218
Yardley, PA 19067
Phone: 215-225-5529 (CALL-LAW)
Facsimile: 888-329-0305
a@perronglaw.com